IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

**UNITED STATES OF AMERICA**

v.                          CRIMINAL NO. 5:06-00025

**ROBERT E. GRAHAM**

<u>MEMORANDUM OPINION</u>

This criminal case was tried to the court from July 24, 2006, until July 28, 2006, defendant having executed a knowing and voluntary waiver of his constitutional right to a trial by jury.  At the conclusion of the trial, the court indicated that it would issue a written opinion containing its findings of fact and outlining its reasoning for the disposition of this case in accordance with Rule 23 of the Federal Rules of Criminal Procedure.  Accordingly, for the reasons outlined below, the court finds defendant guilty as to Count Fourteen of the Second Superseding Indictment, and not guilty as to Counts One through Thirteen and Fifteen through Thirty-Nine of the Second Superseding Indictment.

### A.  Factual Background

At all times relevant to the allegations contained in the Second Superseding Indictment, defendant Robert Graham was Executive Director of Wyoming County Council on Aging, Inc. ("COA"), a nonprofit corporation doing business largely in Wyoming County, West Virginia, and located in the Southern

District of West Virginia, and of a related nonprofit corporation, All-Care Home and Community Services, Inc. ("All-Care"), which was dedicated to providing various services to elderly and disabled citizens. (See Doc. No. 86 at 1.) COA received most of its funding from the State of West Virginia, Medicaid, and the United States Department of Labor. (Id. at 1.) All-Care was largely funded by Medicaid. (Id. at 2.)

The Second Superseding Indictment alleges that defendant engaged in various illegal schemes to enrich himself at the expense of these two organizations and the well-being of the persons they served in West Virginia. The allegations contained in the Second Superseding Indictment fall into several categories: (1) offenses related to the purchase of the plasma-screen television; (2) offenses related to the SEP IRA plan; (3) offenses relating to defendant "cashing out" sick leave; (4) offenses related to defendant's taxes; and (5) offenses related to more than one of these categories. The court discusses below each of these areas of allegation, and the evidence introduced at trial related to them.

**B. Analysis**

**(1) Purchase of the Plasma-Screen Television**[1]

Two counts of the Second Superseding Indictment relate to defendant Graham's use of COA staff and funds to purchase a flat-screen television from CDWG, Inc. at a cost of $6,306.84. Count Twenty-Two alleges that defendant violated 18 U.S.C. § 666(a)(1)(A) by directing COA employees to issue a check in this amount to CDWG, Inc. (See Doc. No. 86 at 25.) Through this, the government alleges that defendant committed a theft of money from COA, an organization receiving in excess of $10,000.00 under a federal program involving federal money. (Id.) The statute requires a theft of property that is valued at more than $5,000.00. See 28 U.S.C. § 666(a)(1)(A)(I).

At trial, evidence established that, in close proximity to the time the check to CDWG, Inc. was issued, defendant Graham wrote a check for $6,306.84 to COA. Defendant's check was deposited in COA accounts before COA's check to CDWG, Inc. had been cashed. It can be inferred from this that defendant was not attempting to steal funds from COA; instead, he was attempting to use COA's status as a government-funded organization to pay less

---

[1] Count Four of the Indictment alleges that defendant mailed a letter containing a check for $6,306.84 of COA's money to purchase a plasma-screen television, along with speakers and a mounting bracket from CDWG, Inc. (See Doc. No. 86 at 13; Trial Exs 46-52.) Count Twenty-Two alleges that defendant committed theft from COA for the same action. (See id. at 25-26.)

for a plasma-screen television than he otherwise would have.  By purchasing the television in this manner, defendant also avoided paying sales taxes.  Although these actions were doubtlessly improper and unethical, they did not violate 18 U.S.C. § 666(a)(1)(A) since defendant appears not to have had the requisite intent to deprive COA of property valued at more than $5,000.00 and did not in fact deprive COA of anything.  Further, the court rejects the government's argument that defendant's failure to have parties submit bids for a television intended for his personal use in contravention of agency policy necessitates a finding of guilt as to this Count.

Additionally, at trial, evidence established that one employee spent approximately an hour researching plasma screen televisions for defendant, and several other employees installed the television while being paid by COA or All-Care.  While use of COA's employees in this manner was clearly improper and inconsistent with Graham's duties as Executive Director, it is not sufficient to prove a violation of the statute.  These actions, even if taken together, did not deprive COA of more than $5,000.00 worth of these employees' wages.

Count Four of the Second Superseding Indictment, alleging that defendant's deposit of the COA check into the mail constituted mail fraud in violation of 18 U.S.C. § 1341, (see Doc. No. 86 at 13), must fail because, as discussed above, there

is no proof that defendant's use of COA's government-funded status to purchase the television was part of a scheme to defraud COA or All-Care.[2]

**(2) SEP IRA**[3]

Counts Fifteen through Twenty-One of the Second Superseding Indictment relate to the SEP IRA. All of the charges allege violations of 18 U.S.C. § 666(A)(1)(a), theft from a program receiving government funds. (See Doc. No. 86 at 18-23.) The government's theory underlying these Counts is that defendant misappropriated money from COA and All-Care at different times through running a disqualified SEP IRA plan. (See id. at 3-5.) However, in the court's view, the government has failed to show beyond a reasonable doubt that defendant was aware that the plan was illegal.

No witness at trial testified that defendant attempted to set up an illegal IRA. Indeed, Samuel Perdue, the person who actually set up the IRA in the 1980s, testified that he could not remember whether it was he or defendant who originally proposed a

---

[2] The Second Superseding Indictment alleges that defendant's scheme defrauded COA and All-Care, not CDWG, Inc. (See Doc. No. 86 at 7.) Defendant's false statements to CDWG, Inc., that the television was for the use of COA, did not harm COA or All-Care. These entities lost neither their ability to purchase goods at reduced rates nor any money through defendant's improper purchase of the television.

[3] Counts Fifteen through Twenty-One of the Second Superseding Indictment relate to the SEP IRA. (See Doc. No. 86 at 18-23.)

SEP IRA instead of some other kind of pension plan.  Perdue indicated that they eventually settled on a SEP IRA because, after inquiry, they believed that other IRAs would be too costly for their organizations.  Perdue indicated that it was primarily his, and not defendant's, job to set up the SEP IRA, and that Perdue, not Graham, delivered the relevant papers to a bank in Pineville where the SEP IRA was eventually set up.

For the government to prove Graham guilty on these Counts, it would have to establish that he was aware that the SEP IRA did not conform to the requirements of the law.  There is some circumstantial evidence supporting this notion, but it falls below the standard of proof beyond a reasonable doubt.  Perdue, for instance, testified that he considered defendant to be "detail oriented" and "hands on."[4]  Others testified that Graham personally decided who was eligible to participate in the SEP IRA, and that some employees with whom Graham had close relationships, including his children, were included in the SEP IRA even though other similarly situated persons were not included.

However, considering the whole of the evidence, the court concludes that the government did not meet its burden of proof on

---

[4] This testimony accords with that of Jennifer Ileene Gibson, the current Interim Executive Director of COA and All-Care, who notes that defendant was highly interested in the details of the organizations' operations when she had previously worked under him in finance from 1999 until 2004.

these counts. There is no evidence that Graham read, or understood, the SEP IRA documents in the 1980s, and no proof that he had become aware of SEP IRA requirements more than fifteen years later, the date of the allegations contained in the Second Superseding Indictment. Although Ronald L. Bolling, the bank official who helped Perdue set up the SEP IRA, testified, he did not testify that he had any discussion with defendant as to the SEP IRA's requirements. John Empson, an accountant who audited COA and All-Care, initially believed the IRA did not conform to the law's requirements, and told Graham so. Upon further inquiry, however, Empson issued his audit report without a write-up for the SEP IRA, having concluded it was not in violation of law.

**(3) Sick Leave**[5]

Two counts of the Second Superseding Indictment allege that defendant violated 18 U.S.C. § 666(A)(1)(a) by having COA and All-Care's boards of directors approve an employment contract that allowed him to receive money for unused sick leave.[6]

---

[5] Counts Thirteen and Fourteen of the Second Superseding Indictment relate to defendant improperly "buying out" sick leave. (See Doc. No. 86 at 16-17.)

[6] Additionally, Count Three of the Second Superseding Indictment, alleging that defendant's electronic transfer of funds in the amount of $12,954.94 from COA to his personal checking account constituted wire fraud in violation of 18 U.S.C. § 1343 and 1346, (see Doc. No. 86 at 12) must fail as there is no indication that this transfer was part of a larger scheme to defraud COA. These statutes require that the government prove beyond a reasonable doubt that defendant had engaged in a scheme to defraud,

The government's theory is that the existence of defendant's employment contract is not enough to exonerate him from these charges because the board's consent was not informed.

At trial, evidence was introduced that, in 2001, defendant negotiated a contract with All-Care that would pay him $185,000.00 per year in salary, and also let him "buy out" unused sick leave.  This contract became effective when later ratified by the board of directors.  Over time, defendant cashed in approximately 1200 hours worth of sick leave.  While he initially went before the board and asked permission to buy out leave,[7] he later stopped doing this.[8]  Because of ongoing state

---

and not an isolated instance of misappropriation of money such as is alleged here. As such, Count Three of the Second Superseding Indictment also fails.

[7] For instance, Board of Director's minutes dated January 27, 2003, introduced at trial as Gov. Ex. 11 note that "The Executive Director requested permission to buy accrued sick leave.  Motion was made by Hazel Morgan to approve, authorize and accept the personnel report as presented and was seconded by Joan Flaim.  Passed unanimously." (See id. at 2.) He again requested permission at meetings on March 27, 2003, and May 14, 2003.  (See Gov. Ex. 18, Director's Notes for March 27, 2003, and Gov. Ex. 20, Director's Notes for May 14, 2003.)  At trial, Dawn Clay, who worked at COA in an administrative capacity in 2003 and attended the board meetings, indicated that she was present at board meetings where defendant's proposal to "buy out" sick leave was discussed, and that board members assented to this proposal.

[8] Defendant "bought out" 125 hours of sick leave valued at $6,953.43 in June 2003 (see Gov. Exs. 22 & 23), 350 hours of sick leave valued at $31,129.81 in July 2003 (see Gov. Exs. 28 & 29), 250 hours to "pay for TV" valued at $12,954.94 on January 14, 2004 (see Gov. Exs. 35 & 36), and 100 hours on February 10, 2004, for $5,344.97 (see Gov. Exs. 38 & 39.)

investigations into his behavior, defendant and the board agreed that he would repay before April 15, 2004 all of the sick leave he had "bought out". Graham did so. (See Gov. Ex. 41.)

The court reaches different conclusions on Counts Thirteen and Fourteen. Evidence establishes that, in 2003, defendant went to the boards of COA and All-Care and requested board approval prior to cashing in sick leave. The board's sanction of defendant's behavior, regardless of the ability of its members to fully comprehend the intricacies of the organizations' finances, leads this court to conclude that defendant did not violate 18 U.S.C. § 666(A)(1)(a) as to Count Thirteen. Even though the court doubts that the board members comprehended in detail all of the matters before them, they did consent. Their assent, regardless of their level of competence, creates a reasonable doubt as to Count Thirteen.

On the other hand, the evidence at trial did establish that defendant was guilty of Count Fourteen. It shows clearly that he did not return to the board and seek the same approval for his last buy out of sick leave even though he knew he was supposed to do so. Count Fourteen alleges that defendant did knowingly "embezzle, steal, obtain by fraud and otherwise without authority convert to the use of a person other than the rightful

owner . . . property valued at approximately $31,129.00" that was under the care, custody, and control of COA by cashing in sick leave during 2004.

In order to establish the offense charged in Count Fourteen, the United States had to prove the following five essential elements by competent evidence beyond a reasonable doubt:

**First:** That at the times alleged in the Second Superseding Indictment, defendant was an agent of Council on the Aging or All-Care;

**Second:** That the defendant knowingly embezzled, stole, obtained by fraud, or otherwise without authority converted to the use of a person other than the rightful owner, or intentionally misapplied property;

**Third:** That the property was owned by or was under the care, custody, and control of the Council on Aging or All-Care as alleged;

**Fourth:** That the property had a value of $5,000 or more; and

**Fifth:** That in a one-year period, the Council on Aging or All-Care received federal benefits in excess of $10,000.00, under any Federal Program involving a grant, contract, subsidy, loan, guarantee, insurance or other assistance.

<u>Sabri v. United States</u>, 541 U.S. 600 (2004); <u>Morisette v. United States</u>, 342 U.S. 246 (1952).

The court finds that the United States has met its burden of proof on this count and, accordingly, finds defendant guilty of Count Fourteen.  The evidence clearly satisfies the first, third, fourth and fifth elements.  It is not disputed that, at the time alleged in Count Fourteen, Graham was the Executive Director of COA and that COA paid him for the sick leave with COA funds.  <u>See</u> Gov. Exs. 38-40.  The testimony of Jennifer Ileene Gibson, which the court believes, clearly established that COA received well over $10,000 in federal benefits during the relevant time period.  Gibson served as COA's bookkeeper and administrative assistant from 1999 until February, 2006, when she became its Interim Director.  With regard to the second element, the conclusion is inescapable that Graham cashed in the sick leave without the approval of his board, knowing he needed board approval, thereby effectively stealing the money or converting it to his own use.[9]

From the evidence taken at trial it is clear that defendant, an employee, took this money from COA without having any board approval whatsoever.  These transactions each constituted major changes of the sort that required board approval.  The fact that Graham sought board approval for the earlier cash-outs of sick leave is compelling evidence that he knew such approval was required.  Graham cavalierly disregarded the board and treated

---

[9]As the exhibits show, Graham took part of the sick leave in cash, but the bulk of the cash-out was in the form of personal income taxes withheld and remitted to the IRS.

large amounts of COA's money as if it were his own, diverting it to his personal use and to the detriment of those whom COA and All-Care were created and funded to serve.

### (4) Falsifying Tax Returns

Counts Five through Twelve of the Indictment allege that defendant filed false tax returns for COA and All-Care for fiscal years 2001-04. (See Doc. No. 86 at 14-15.) Counts Twenty-Six through Thirty-Nine of the Second Superseding Indictment allege that defendant committed tax fraud through his failure to report certain IRA contributions as income as opposed to contributions to SEP IRAs, or by allowing COA and All-Care to file tax returns showing contributions to an improper SEP IRA. (See Doc. No. 86 at 31-44.) All of these counts fail because the government did not prove beyond a reasonable doubt that defendant knew the SEP IRA was improper.

At trial, COA's accountant, John Empson, testified that he was granted access to much of COA's paperwork, that he reviewed it, and that he met with COA's prior accountant to discuss COA's pension plan. He testified that he analyzed the books of these organizations in great detail and that, following his review, he issued an audit report that did not contain a write-up for the SEP IRA. The government did not present sufficient evidence to support its theory that defendant had hidden paperwork showing that the SEP IRA was improper. A reasonable conclusion from the

evidence is that some of the documents were lost or misfiled, not concealed, and there is no evidence that Graham ordered the destruction or concealment of records he knew would show the SEP IRA to be inconsistent with the law's requirements. Because the government failed to establish that defendant knew any tax return involved in this case contained false information, all of the counts in the Second Superseding Indictment charging that defendant wilfully filed a false tax return, or signed off on a false return of COA's, or that he aided others to file false tax returns for COA or All-Care must fail.

**(5) Overarching Conspiracy to Defraud**[10]

Counts One and Two of the Second Superseding Indictment are the only counts remaining. In them, the government's theory is that defendant perpetrated a scheme to defraud COA and All-Care by using them to facilitate his purchase of the television, having them improperly pay for his ex-wife's health insurance, the fraudulent buy-out of sick leave, and the illegal SEP IRA.

All of these points have been covered above except for defendant's inclusion of his ex-wife in the COA / All-Care health insurance program. At trial, evidence established that neither COA nor All-Care paid more money for health insurance because defendant improperly listed his ex-wife as his dependant. The

---

[10] Counts One and Two of the Second Superseding Indictment allege that defendant committed mail fraud. (See Doc. No. 86 at 1-11.)

government's speculation that these entities would be liable if defendant's ex-wife had been sick is not sufficient, in the court's view, to establish mail fraud in violation of 18 U.S.C. §§ 1341, 1346, and 2(b). As such, the court finds defendant not guilty as to Counts One and Two of the Indictment.

### (6) Forfeiture

For the reasons discussed above, the court found defendant not guilty of every count of the Second Superseding Indictment except Count Fourteen. As such, the only amount of forfeiture remaining at issue is the amount discussed in Paragraph (b.) of the Forfeiture section of the Second Superseding Indictment. (See Doc. No. 86 at 45). Since Graham has been found guilty of Count Fourteen, he is liable for the forfeiture that corresponds to that count. Therefore, pursuant to 28 U.S.C. § 2461(c), 18 U.S.C. § 981(a)(1)(C), and the Federal Rules of Criminal Procedure, the court orders the forfeiture of $31,129.00 in United States currency, provided that this currency has not been returned to COA or All-Care.

### C. Conclusion

The events leading to this indictment are improper and outrageous and cannot be condoned by the court. Graham failed miserably to fulfill his duties as a public servant, engaging in conduct that squandered public resources and adopting a life-

style that reflected discredit upon COA and All-Care, their directors and employees.  Bad conduct in and of itself, however, does not equal criminal conduct.  To convict a defendant of a crime, the government must establish beyond a reasonable doubt by competent evidence each and every element of each and every crime charged.  Except for Count Fourteen, the government has failed to do so.  It is the court's duty to acquit the defendant as to each count except Fourteen, just as it is the court's duty to find him guilty of that count.

    A separate judgment order will be entered today implementing this decision.

    Dated this 30th day of August, 2006.

ENTER:

*David A. Faber*
David A. Faber
Chief Judge